**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:02 CV 125 |
| v. | ) | (arising from 2:99 CR 86) |
| | ) | |
| CHARLES SCOTT, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Charles Scott ("Scott") is a prisoner whose incarceration results from a judgment

of this court. On July 26, 2002, Scott initiated this post-conviction proceeding by filing a

motion as prescribed by the act of Congress codified at 28 U.S.C. § 2255. The court

subsequently directed the United States Attorney to enter his appearance and file an

Answer, after which Scott filed a Reply. After reviewing these materials and the record

compiled in the underlying criminal case, this court shall **DENY** Scott's motion.

**I. BACKGROUND**

On May 20, 1999, a grand jury returned a ten-count indictment charging Scott,

along with his brother Carl Buggs and two others, Drew Carter and Nathaniel

Rimpson, with robbing at gunpoint several businesses in Gary, Indiana (mostly in the

neighborhood of Ivanhoe). More particularly, the indictment charged Scott with one

count of conspiring to violate the Hobbs Act, 18 USC § 1951[1], (*see* Indictment[2], at

---

[1] "The Hobbs Act prohibits any robbery or extortion or attempt or conspiracy to
rob or extort that 'in any way or degree obstructs, delays or affects commerce or the
movement of any article or commodity in commerce.' " *United States v. Bailey*, 227 F.3d

Count 1), three substantive Hobbs Act violations, (*see* Indictment, at Counts 2, 4, 8), and three counts of carrying a firearm in connection with a violent crime, 18 U.S.C. § 924(c), (*see* Indictment, at Counts 3, 5, 9). Scott pleaded not guilty to the indictment (as did all his co-defendants), and thus proceeded to trial.

At trial, the Government established that armed men robbed three separate grocery stores in Gary, Indiana on September 2, 1997, September 6, 1997, and February 26, 1998, respectively, and that two armed men robbed a barber shop in Gary, Indiana on December 13, 1997. The perpetrators of each robbery wore disguises, permitting little identification evidence. The government produced several witnesses at trial, at least two of whom, Tommy Sherrell Johnson ("Johnson") and Edward Colier ("Colier"), had been involved at some level in at least one of the robberies. Johnson, an acquaintance of the four defendants, testified that Carl Buggs conscripted him to act as driver during the February 26, 1998 robbery of a grocery store in which Buggs, Carter, and Scott participated. (T. Tr. Vol. 3, at 173-74). According to Johnson, he ultimately received $100.00 for his troubles. (T. Tr. Vol. 3, at 177). Colier, another "associate" of the defendants, testified that Rimpson hired him to steal a car which was later used by Rimpson and Scott in the September 2, 1997 robbery of Ralph's Foods. (T. Tr. Vol. 3, at 247-48). Colier was apparently paid $500.00 for his efforts. (T. Tr. Vol. 3, at 247).

---

792, 797 (7th Cir. 2000) (quoting 18 U.S.C. § 1951(a)); *accord United States v. Marrero*, 299 F.3d 653, 654 (7th Cir. 2002) ("The Hobbs Act criminalizes robberies that obstruct or otherwise affect interstate commerce.").

[2] The Indictment can be found in Cause No. 2:99 CR 86 at docket # 1.

2

In addition to the testimony of Johnson and Colier, the Government also presented evidence which demonstrated that during the pertinent time frame none of the four defendants was employed. It also placed exhibits into the record tending to prove that defendant Carter was released from the Lake County Jail thanks to cash posted in an amount approximately equal to the proceeds from the September 2, 1997 robbery of Ralph's Foods. The parties stipulated that the bond was posted on September 3, 1997 (the day after the robbery), and that Rimpson signed the receipt at the cashier's window. (T. Tr. Vol. 4, at 9). Less than one week after the September 6, 1997 robbery, Buggs was released from the Lake County Jail courtesy of $5,000.00 cash posted by his brother, Charles Scott. (T. Tr. Vol. 4, at 8). On the same day of the February 26, 1998 robbery, Scott purchased a Suzuki motorcycle. A few days later, $5,000.00 cash was posted to secure Rimpson's release from the Lake County Jail. (T. Tr. Vol. 4, at 7-8).

Given such evidence, the jury returned guilty verdicts on all Counts pending against Scott. On November 10, 1999, the court convened a sentencing hearing, at which time Scott asked the court for a new attorney. His request was granted, and his trial attorney, Corinth Bishop, was permitted to withdraw from further representation. The sentencing hearing was continued, and the court eventually appointed Charles Stewart to represent Scott. However, on April 20, 2000, Scott filed a motion for withdrawal of attorney Stewart, which the court granted. Scott eventually appeared for sentencing on May 30, 2000, represented by attorney Frederick F. Cohn. Scott was sentenced on

3

Counts 1, 2, 3, 4, 5, 8, and 9 of the indictment, and was committed to the custody of the Bureau of Prisons for a term of 618 months. This term of imprisonment consists of 78 months on each of Counts 1, 2, 4, and 8, all to be served concurrently, 60 months on Count 3, to be served consecutively to the terms imposed on Counts 1, 2, 4, and 8, and 240 months on each of Counts 5 and 9, to be served consecutively to each other and consecutively to the terms imposed on Counts 1, 2, 3, 4, and 8.

Scott and his co-defendants each filed timely appeals in which they raised a number of issues. On appeal, Scott and his co-defendants argued: (1) that the evidence at trial was insufficient to establish obstruction of interstate commerce, an essential element of the charged Hobbs Act violations; (2) that the indictment was defectively drafted; (3) that they failed to receive a speedy trial; (4) that the United States Attorney violated the Jencks Act, 18 U.S.C. § 3500, by failing to provide the transcript of certain testimony to the grand jury; and, (5) that this court erred in refusing to instruct the jury to receive with care the testimony of Colier. The Court of Appeals affirmed in all respects, concluding "[t]he trial was fair and the convictions are well supported." *United States v. Buggs*, 6 Fed. Appx. 484, 488 (7th Cir. 2001). The United States Supreme Court denied Scott's prayer for a writ of certiorari on November 26, 2001. *United States v. Scott*, 534 U.S. 1043 (2001).

Scott thus commenced this post-conviction proceeding by timely filing a motion "to vacate, set aside or correct" his sentence as authorized by 28 U.S.C. § 2255. In his motion, Scott presents several claims of ineffective assistance of both trial and appellate

counsel. The court performed the prescribed initial review, *see* RULES GOVERNING SECTION 2255 PROCEEDINGS 4(b) ("The judge who receives the § 2255 motion must promptly examine it."), and concluded that an answer from the United States Attorney would aid the court in determining the merits of Scott's § 2255 motion. The motion appears to have been fully briefed on March 10, 2003, after several extensions of time were allotted to both the Government and Scott to file their response and reply, respectively. Scott has since filed at least two supplements to his § 2255 motion specifically discussing the (potential) affect of the recent Supreme Court decisions in *United States v. Blakely*, 542 U.S. 296 (2004), and *United States v. Booker,* — U.S. —, 125 S. Ct. 738, — L. Ed. 2d —, 2005 WL 50108 (U.S. Jan. 12, 2005), upon his sentence.

The court has examined all of Scott's papers, the United States Attorney's Answer, and the transcripts of the proceedings leading up to this court's judgment imposing Scott's present term of imprisonment. For the reasons explained in the remainder of this Order, the court shall **DENY** Scott's motion.

## II. LEGAL STANDARD

"No prisoner has a constitutional entitlement to further review of the final judgment in a criminal case." *Farmer v. Litscher*, 303 F.3d 840, 844 (7th Cir. 2002) (citing *Freeman v. Page*, 208 F.3d 572, 576 (7th Cir. 2000)). However, with the enactment of 28 U.S.C. § 2255, Congress gave federal prisoners a right to launch a collateral attack against their conviction. Section 2255 ultimately grants the federal courts power "to vacate, set aside or correct the sentence" of a convicted prisoner, 28 U.S.C. § 2255 ¶ 1,

but only if the prisoner is able to expose flaws in his conviction "which are jurisdictional in nature, constitutional in magnitude, or result in a complete miscarriage of justice," *Boyer v. United States*, 55 F.3d 296, 298 (7th Cir. 1995) (citation omitted). Thus, "relief under 28 U.S.C. § 2255 is reserved for extraordinary situations." *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 633-34 (1993)).[3]

A post-conviction proceeding may not be used as either "a recapitulation of" or "a substitute for" a direct appeal. *McCleese v. United States*, 75 F.3d 1174, 1177 (7th Cir. 1996); *accord United States v. Barger*, 178 F.3d 844, 848 (7th Cir. 1999) (stating that a § 2255 motion "is not to be used as a substitute for a direct appeal" (citing *Theodorou v. United States*, 887 F.2d 1336, 1339 (7th Cir. 1989))). This means, of course, that a defendant may not raise issues in his § 2255 motion that he previously raised on direct appeal unless he is able to demonstrate a change of circumstances. *Belford v. United States*, 975 F.2d 310, 313 (7th Cir. 1992), *overruled on other grounds by Castellanos v. United States*, 26 F.3d 717, 719-20 (7th Cir. 1994). It also means, however, that a defendant may not raise those issues that have been procedurally defaulted, or rather those issues that were not, but

---

[3] Emphasizing the social benefit of finality and advancing a jurisprudence of limited post-conviction success, the United States Supreme Court has stated:

> Once the defendant's chance to appeal has been waived or exhausted, . . . [the court is] entitled to presume he stands fairly and finally convicted, especially when, as here, he already has had a fair opportunity to present his federal claims to a federal forum. Our trial and appellate procedures are not so unreliable that we may not afford their completed operation any binding effect beyond the next in a series of endless postconviction collateral attacks. To the contrary, *a final judgment commands respect*. *United States v. Frady*, 456 U.S. 152, 164-65 (1982) (emphasis added).

could have been raised on direct appeal, unless he is able to "show good cause for failing to raise the issue[s] and actual prejudice." *Galbraith v. United States*, 313 F.3d 1001, 1006 (7th Cir. 2002); *accord Mankarious v. United States*, 282 F.3d 940, 943 (7th Cir. 2002) ("An issue not raised on direct appeal is barred from collateral review absent a showing of both good cause for and actual prejudice resulting from the failure to assert it.").[4]

Scott's § 2255 motion raises a number of issues for review, most of which were not, but could have been raised on appeal. Thus, the doctrine of procedural default should seemingly apply to most, if not all of Scott's claims. However, as Scott (or perhaps his jailhouse lawyer) has cleverly couched Scott's claims in terms of "ineffective assistance" of trial and/or appellate counsel, the doctrine of procedural default does not apply. Indeed, as " '[t]he preferred method for raising a claim of ineffective assistance of counsel is either by bringing a motion for new trial or a request for collateral relief under 28 U.S.C. § 2255,' " Scott may properly raise his ineffective assistance claims for the first time in this § 2255 proceeding. *United States v. Woolley,* 123 F.3d 627, 634 (7th Cir. 1997) (quoting *United States v. Wiman,* 77 F.3d 981, 988 (7th Cir. 1996)); *accord Massaro v. United States*, 538 U.S. 500, 504 (2003) ("We hold that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not

_____

[4] "A showing that a refusal to consider the issue would be a fundamental miscarriage of justice" may also aid a prisoner in attaining review of a procedurally defaulted issue. *Galbraith v. United States*, 313 F.3d 1001, 1006 (7th Cir. 2002) (internal quotation marks and citation omitted).

the petitioner could have raised the claim on direct appeal."); *Jones v. United States*, 264 F. Supp. 2d 714, 716 (N.D. Ill. 2003) ("The Court in *Massaro* made clear . . . that ineffective assistance of counsel claims are an exception . . . and may be brought in a collateral proceeding under § 2255."); *see also United States v. Kelly*, 337 F.3d 897, 903 (7th Cir. 2003) (noting "the well-established principle that the trial record is normally insufficient for an evaluation of effective assistance claims"). Not only may a defendant raise an ineffective assistance claim for the first time in a § 2255 motion, such a claim may also satisfy the "cause" component necessary to overcome procedural default of a particular issue. *Fern v. Gramley,* 99 F.3d 255, 259 n. 4 (7th Cir. 1996).

In seeking to prove that his counsel rendered ineffective assistance, Scott "bears a heavy burden." *Jones v. Page*, 76 F.3d 831, 840 (7th Cir. 1996) (citation omitted). The burden requires Scott to point to particular instances of action (or inaction) on the part of his attorney(s) which allegedly constitute ineffective assistance. *See Berkey v. United States*, 318 F.3d 768, 772 (7th Cir. 2003); *United States v. Farr*, 297 F.3d 651, 657 (7th Cir. 2002); *Fountain v. United States*, 211 F.3d 429, 434 (7th Cir. 2000). Then, Scott must show: (1) that his counsel's performance in those specified situation(s) was unreasonably deficient; and, (2) that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). As the *Strickland* standard is formulated in the conjunctive, Scott must make the requisite showing on *both* elements; failure to prove either deficient conduct or prejudice invalidates an ineffective assistance claim, *see Rastafari v. Anderson*, 278 F.3d 673, 688 (7th Cir. 2002) ("A failure to establish either

[*Strickland*] prong results in a denial of the ineffective assistance of counsel claim.").

When considering whether an attorney's conduct was unreasonably deficient under the first prong of the *Strickland* test, a court must operate under "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and treat counsel's performance with high deference. *Strickland*, 466 U.S. at 689; *see also Williams v. Washington*, 59 F.3d 673, 679 (7th Cir. 1995) (The first prong of *Strickland* "contemplates deference to strategic decision-making"). In order to prevail on the first prong of the *Strickland* test, a defendant must show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. With regard to the second prong, the court will only disturb a criminal conviction if "there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Id.* at 694. In other words, "[i]n order to demonstrate that his federal constitutional right to effective assistance of counsel was violated, a defendant must show that effective assistance would have given him a reasonable shot at acquittal." *Gibbs v. VanNatta*, 329 F.3d 582, 584 (7th Cir. 2003) (noting that this is a "different and lower standard" than proving actual innocence); *see also Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect.").

9

## III. ANALYSIS

With the aforementioned principles in mind, the court shall now turn its attention to determining the merits of the many complaints made by Scott regarding the performance of his trial and/or appellate attorney. The court will address each of Scott's ineffective assistance claims separately, although it shall not necessarily do so in the order in which Scott presented them in his § 2255 motion.

### A. *Duplicity*

Scott's first argument centers upon Counts 2, 4, and 8 of the indictment. Counts 2, 4, and 8 each charge, in pertinent part, that Scott:

> *did* unlawfully obstruct, delay and affect, and *attempt to* obstruct, delay and affect commerce as that term is defined in [18 U.S.C. § 1951], and the movement of articles and commodities in such commerce, by robbery as that term is defined in [18 U.S.C. § 1951] . . . .

(emphasis added). Scott ultimately contends that these Counts are duplicitous because they each charge him with "two or more distinctive and separate offenses," namely robbery and attempted robbery. (Def.'s § 2255 Mem., at 2-3). As duplicitous Counts, Scott alleges that they exposed him to the possibility of a non-unanimous verdict. Consequently, Scott believes his trial attorney rendered ineffective assistance by failing to object to Counts 2, 4, and 8 of the indictment. (Def.'s § 2255 Mem., at 2-4).

The court pauses to note here that Scott's reading of the indictment is inaccurate in as far as the indictment does *not* charge Scott with "robbery" and "attempted robbery," but rather, it charges him with obstructing commerce and attempting to obstruct commerce *by means of robbery*. (*See* Indictment, at Counts 2, 4, 8) (Scott "did

10

unlawfully obstruct, delay and affect, and attempt to obstruct, delay and affect commerce as that term is defined in [18 U.S.C. § 1951] . . . by robbery."). In other words, the terms "did" and "attempt," as used in the indictment, modify the phrase "obstruct, delay and affect commerce," and do not modify the term "robbery." In any event, regardless of Scott's misunderstanding, the court guesses that the argument underlying this ineffective assistance claim – that is, that Counts 2, 4, and 8 charge him with two distinctive and separate offenses, i.e., the actual obstruction of commerce (by robbery) and an attempt to obstruct commerce (by robbery) – still stands.

"Duplicity is the joining in a single count of two or more distinct and separate offenses." *United States v. Orzechowski*, 547 F.2d 978, 986 (7th Cir. 1976) (internal quotation marks and citations omitted). The prohibition against duplicitous indictments arises primarily out of a concern that the jury may find a defendant guilty on a count without having reached a unanimous verdict on the commission of any particular offense. *See United States v. Buchmeier*, 255 F.3d 415, 425 (7th Cir. 2001). Other dangers arising out of a duplicitous indictment include "the possibility that the defendant may not be adequately notified of the charges against him, that he may be subjected to double jeopardy, [and] that he may be prejudiced by evidentiary rulings at trial . . . ." *United States v. Berardi*, 675 F.2d 894, 899 (7th Cir. 1982) (citations omitted); *accord Buchmeier*, 255 F.3d at 425.

Any risk inherent in a duplicitous count may ultimately be cured by a jury instruction that, through some limiting language, requires a jury to unanimously find

11

the defendant guilty of one or the other of the acts charged within the duplicitous count. *Buchmeier*, 255 F.3d at 425. In the instant action, the language of this court's jury instruction No. 18, which relates to Counts 2, 4, and 8, clearly particularizes the Hobbs Act offense charged. The Court's Instruction No. 18 states:

> To sustain the charge of robbery which effected interstate commerce, as charged in Counts 2, 4, [ ], and 8 of the indictment, the government must prove the following propositions:
>
>      FIRST:      that the defendant to whom you are giving consideration knowingly obtained money or property from or in the presence of the employees of the business specified;
>
>      SECOND:     that the defendant did so by means of robbery, as that term is defined in these instructions; and
>
>      THIRD:      that the robbery affected or had the potential to affect interstate commerce.
>
>      If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant to whom you are giving consideration guilty.
>      If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant to whom you are giving consideration not guilty.[5]

This instruction presents to the jury *only one* theory of conviction; it instructs the jury *only* upon the commission of an *actual* Hobbs Act violation (versus, for example, an *attempted* Hobbs Act violation), therefore leaving no question that the decision to convict Scott on Counts 2, 4, and 8 was the product of an unanimous verdict.

---

[5] The court's jury instructions can be found at docket # 81 in Cause No. 2:99 CR 86.

Thus, even assuming, for the sake of argument, that Counts 2, 4, and 8 of the indictment were in fact duplicitous, the court's instruction on Counts 2, 4, and 8 cured any risk(s) to Scott caused by such duplicity. Accordingly then, Scott's ineffective assistance claim on this particular issue must fail as he cannot demonstrate that he suffered any prejudice on account of his attorney's failure to object to the (alleged) duplicitous wording of Counts 2, 4, and 8. *See Strickland*, 466 U.S. at 687 (requiring that a defendant not only demonstrate that his attorney's performance was unreasonably deficient, but also that the defendant was substantially prejudiced by that unreasonably deficient performance).

B. *Insufficient Indictment – Charging the Wrong "Mens Rea"*

Scott's next argument also centers upon Counts 2, 4, and 8 of the indictment. As noted above, Counts 2, 4, and 8 charge, in part, that Scott "did unlawfully obstruct, delay and affect . . . commerce . . . by robbery." (Indictment, at Counts 2, 4, 8). Scott focuses his attention on the term "unlawfully," asserting that "unlawfully" does not "connote the proper *mens rea* for a Hobbs Act conviction." (Def.'s § 2255 Mem., at 8). Instead, Scott argues that the appropriate term is "knowingly." (Def.'s § 2255 Mem., at 8-9). Scott asserts that, in using the term "unlawfully" instead of "knowingly," the indictment failed to properly identify "the necessary and specific essential elements [sic] of criminal intent," and therefore violated the Sixth Amendment's guarantee that the accused "be informed of the nature and cause of the accusation." (Def.'s § 2255 Mem., at 10). Consequently, according to Scott, Counts 2, 4, and 8 of the indictment were fatally

13

flawed, and his attorney was ineffective by not moving to dismiss those Counts. (Def.'s
§ 2255 Mem., at 8-11).

To begin with, the issue underlying Scott's ineffective assistance claim – that the
indictment is defective because it does not allege that Scott acted "knowingly" – was
presented by Scott on appeal to the Seventh Circuit, and has therefore already been
decided by that Court. The Court of Appeals ultimately determined that because the
indictment tracked the statutory language of the Hobbs Act, "[t]here was thus no plain
error," in using the word "unlawfully" in the indictment. *Buggs*, 6 Fed. Appx. at 487. As
a § 2255 motion is "neither a recapitulation of nor a substitute for a direct appeal,"
*McCleese,* 75 F.3d at 1177, it surely seems that Scott should not be able to re-present this
issue here hoping to receive a more favorable outcome. Of course, there is a slight, but
nonetheless important difference between Scott's claim presented on appeal and that
presented now in his § 2255 motion. The difference is that, in his § 2255 motion, Scott
cleverly tacks an ineffective assistance claim on the front end of his insufficient
indictment claim. By "dressing" his insufficient indictment claim with a new hat, it
seems that Scott has finagled a way to slide an already-decided issue through the back
door of a § 2255 review.[6] Certainly, it is difficult for this court to find ineffective

---

[6] A federal prisoner may not use a § 2255 motion as a vehicle to circumvent
decisions made by the appellate court in a direct appeal. *Frady,* 456 U.S. at 165; *Doe v.
United States,* 51 F.3d 693, 698 (7th Cir. 1995). Yet, it seems to this court that by adding
the two little words "ineffective assistance" to any issue previously-presented by a
prisoner to an appellate court, a prisoner is effectively able to do just that – circumvent
an unfavorable appellate court decision on a particular issue, and take another bite of
the apple. This is why this court has previously described ineffective assistance claims

assistance on the part of Scott's trial attorney for failing to object to an indictment that the Appellate Court found sufficient. Nevertheless, because a § 2255 proceeding is "[t]he preferred method for raising a claim of ineffective assistance of counsel," *see Woolley,* 123 F.3d at 634 (internal quotation marks and citation omitted), and because plain error review is of a different species than the review for ineffective assistance,[7] this court will accordingly address the issue.

Before this court dives into its analysis however, it is imperative to note that there is no *mens rea* requirement in connection with the interstate nexus portion of 18 U.S.C. § 1951. In other words, Scott need not have had knowledge that his actions could or would affect interstate commerce. *See United States v. Lindemann,* 85 F.3d 1232, 1241 (7th Cir. 1996) ("[I]t has consistently been held that for statutes in which Congress included an 'interstate nexus' for the purpose of establishing a basis for its authority, the government must prove that the defendant knew he was involved in the wrongful conduct, but need not prove that the defendant knew the 'interstate nexus' of his actions."). Thus, Scott's problem with the wording of the indictment must lie with its

---

as the Trojan horse of § 2255 motions. *United States v. Zaragoza,* 16 F. Supp. 2d 1111 (N.D. Ind. 1998).

[7] Overcoming the plain error standard, which requires the presence of a "manifest miscarriage of justice," is very difficult. *United States v. Owens,* 301 F.3d 521, 528 (7th Cir. 2002); *see also United States v. Taylor,* 226 F.3d 593, 597-98 (7th Cir. 2000) ("Manifest miscarriage of justice is perhaps the most demanding standard of appellate review. We will reverse only if the record is devoid of evidence pointing to guilt, or if the evidence on a key element of the offense was so tenuous that a conviction would be shocking.").

15

use of the term "unlawfully" to describe the robbery element of the charged Hobbs Act

offenses. (*See* Indictment at Counts 2, 4, 8) (" . . . Scott . . . did unlawfully take and obtain

property . . . by means of actual and threatened force, violence, and fear of injury.").

In order to prove that he received ineffective assistance of counsel in this

instance, Scott must first demonstrate that his attorney's conduct in failing to object to

Counts 2, 4, and 8 of the indictment as defective fell below an objective standard of

reasonableness. *See Strickland*, 466 U.S. at 687. Reasonableness is measured under the

standard of prevailing professional norms, *Coleman v. United States*, 318 F.3d 754, 760

(7th Cir. 2003) (citing *Hough v. Anderson*, 272 F.3d 878, 890 (7th Cir. 2001)), which can, in

many instances, be determined by comparing one attorney's performance with that of

others similarly situated. In this case, there were four defendants, each represented by a

different, experienced lawyer, and not one of those lawyers attacked the indictment

based upon its failure to include the term "knowingly" (versus "unlawfully") in the

substantive Hobbs Act charges. This court is to treat the performance of each of those

four, experienced attorneys with high deference, *Strickland*, 466 U.S. at 689; and, the fact

that each of the attorneys in this case conducted themselves in a similar manner with

regard to this issue indicates to this court that Scott's attorney acted within the wide

range of professionally competent assistance in not objecting to Counts 2, 4, and 8.

Moreover, as the Seventh Circuit noted in its opinion affirming Scott's appeal, the

language of the indictment in the instant action tracked that of the Hobbs Act itself,

*Buggs*, 6 Fed. Appx. at 487, which "is generally sufficient," *see Hamling v. United States*,

418 U.S. 87, 117 (1974).

However, even if one were to assume, for the sake of argument, that Scott's attorney acted unreasonably in failing to object to the particular language of Counts 2, 4, and 8, Scott still must satisfy the prejudice prong of the *Strickland* test to prevail on an ineffective assistance claim. *See Rastafari*, 278 F.3d at 688. In an attempt to do so, Scott generally avers that he was prejudiced by his attorney's failure to object to the indictment because, by not using the word "knowingly" in Counts 2, 4, and 8, the indictment failed to put him on notice that he was being charged with "knowledge," thereby preventing him from preparing a proper defense. (Def.'s § 2255 Mem., at 20). Yet, Scott does not elaborate on what his "proper" defense might have been had the word "knowingly" instead of "unlawfully" appeared in the indictment. Conclusory and vague assertions of prejudice, such as that presented by Scott here, are insufficient to satisfy *Strickland's* prejudice component. *See Barkauskas v. Lane,* 946 F.2d 1292, 1295 (7th Cir. 1991); *United States v. Asubonteng*, 895 F.2d 424, 429 (7th Cir. 1990).

Moreover, such a phrase – "did unlawfully take and obtain property . . . by means of actual and threatened force, violence, and fear of injury," (*see* Indictment, at Counts 2, 4, 8) – necessarily imparts an allegation that Scott acted knowingly, or rather, intentionally and voluntarily. Indeed, it is hard for this court to imagine how it is that one could "unlawfully take and obtain property . . . by means of actual and threatened force, violence, and fear of injury" by, for example, mistake or accident. Ultimately, the indictment's language "without any uncertainty or ambiguity," places Scott on notice

that "knowledge" is a necessary element of the charged offense(s). *See Hamling*, 418 U.S. at 117.

Finally, the Court's Instruction No. 18 (which concerns the Hobbs Act charges) expressly states that in order to sustain the charge of robbery which affected interstate commerce, the government must prove, beyond a reasonable doubt, that "[Scott] *knowingly* obtained money or property from or in the presence of the employees of the business specified . . . ." Thus, the jury was quite clearly instructed as to what Scott describes as the "proper" *mens rea* for robbery, (*see* Def.'s § 2255 Mem., at 8), and the resulting convictions on Counts 2, 4, and 8 were therefore premised upon the idea that Scott "knowingly" committed robbery. Accordingly, even assuming that Scott's attorney acted unreasonably in failing to object to the use of the term "unlawfully" in Counts 2, 4, and 8, it is clear that Scott did not suffer any prejudice. Therefore, Scott's ineffective assistance claim on this issue must fail.

C. *Constructive Amendment to the Indictment*

In Scott's next claim, he once again focuses his attentions on the word "knowingly," although this time Scott argues that the term should *not* have appeared in the Court's Instruction No. 18.[8] Scott asserts that the court's use of "knowingly" within

---

[8] As previously noted, the Court's Instruction No. 18 states, in pertinent part:

To sustain the charge of robbery which effected interstate commerce, as charged in Counts 2, 4, [ ], and 8 of the indictment, the government must prove the following propositions:

FIRST:       that [Scott] *knowingly* obtained money or property

18

the instruction impermissibly deviates from the indictment, (Def.'s § 2255 Mem., at 13-16), which simply charges that Scott did "did *unlawfully* take and obtain property . . . by means of actual and threatened force, violence, and fear of injury," (Indictment, at Counts 2, 4, 8) (emphasis added). Scott argues that this "deviation" is a constructive amendment of the indictment, and therefore, his attorney was ineffective in failing to object to the instruction. (Def.'s § 2255 Mem., at 13-16).

A constructive amendment to an indictment results when the court and/or government broadens "the possible bases for conviction beyond those presented by the grand jury." *United States v. Cusimano*, 148 F.3d 824, 829 (7th Cir. 1998). Such amendments to an indictment are prohibited by the Fifth Amendment which "requires that the allegations in the indictment and the proof at trial match in order to insure that the defendant is not subject to a second prosecution, and to give the defendant reasonable notice so that he may prepare a defense." *United States v. Trennell*, 290 F.3d 881, 888 (2002) (internal quotation marks and citation omitted). As it relates to jury instructions, constructive amendments occur where the language of the instruction materially alters the theory of criminal liability charged in the grand jury's indictment, thus creating a likelihood that the defendant may have been convicted of an offense other than that charged in the indictment. *See United States v. Muelbl*, 739 F.2d 1175, 1181 (7th Cir. 1984); *see also United States v. Williams*, 798 F.2d 1024, 1033 (7th Cir. 1986) ("The

---

from or in the presence of the employees of the business specified . . . . (emphasis added).

general rule in this area is that the trial court cannot amend the indictment at the instruction stage by eliminating or changing an essential or material element of the crime."); *United States v. Hathaway*, 798 F.2d 902, 910 (6th Cir. 1986) ("A constructive amendment occurs when the terms of an indictment are in effect altered by the presentation of . . . jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.").

Counts 2, 4, and 8 of the indictment in the instant action charge Scott with three substantive Hobbs Act violations. To sustain a conviction under the Hobbs Act, the government must prove two elements beyond a reasonable doubt: robbery, and an affect on interstate commerce. *United States v. Peterson, 236* F.3d 848, 851 (7th Cir. 2001). As already noted in Section III.B of this Order, there is no *mens rea* requirement in connection with the interstate commerce element of a Hobbs Act offense. *See Lindemann*, 85 F.3d at 1241. However, as the Seventh Circuit stated at Scott's appeal, "the robbery element of [a Hobbs Act offense] does imply some mental elements: the defendants must know that they are not entitled to what they take, and they must intend to keep it." *Buggs*, 6 Fed. Appx. at 487.

The Court's Instruction No. 18 clearly and concisely sets forth the two elements of a Hobbs Act violation, and appropriately notes the necessary *mens rea* – "knowingly"

– for the robbery element. (*See* Court's Instruction No. 18)[9]. Accordingly, the Court's Instruction No. 18 does not in an way broaden, deviate, or alter the Hobbs Act offenses charged by the grand jury. Rather, by specifically articulating the essential elements of a Hobbs Act violation, the instruction ensured that Scott was in fact convicted of Hobbs Act offenses. Thus, the court's jury instruction on the Hobbs Act offenses did not constructively amend the indictment. *See Hathaway*, 798 F.2d at 910 ("A constructive amendment occurs when the terms of an indictment are in effect altered . . . [creating] a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment."); *Muelbl*, 739 F.2d at 1181 (jury instruction does not constructively amend indictment if it does not "materially alter[ ] the theory of criminal liability charged in the grand jury indictment"). Therefore, Scott's attorney did not act unreasonably in not objecting to the instruction as an impermissible amendment of the charging instrument. Scott's request for relief on this issue is consequently

─────────────────

[9] Once again, the Court's Instruction No. 18 states, in pertinent part:

To sustain the charge of robbery which effected interstate commerce, as charged in Counts 2, 4, [ ], and 8 of the indictment, the government must prove the following propositions:

FIRST:          that the defendant to whom you are giving consideration knowingly obtained money or property from or in the presence of the employees of the business specified;

SECOND:          that the defendant did so by means of robbery, as that term is defined in these instructions; and

THIRD:          that the robbery affected or had the potential to affect interstate commerce.

denied.

D. *Insufficient Evidence on Counts 3, 5, and 9*

Scott's fourth ineffective assistance argument concerns his attorney's failure to object to what Scott claims was insufficient evidence presented by the government on Counts 3, 5, and 9. Counts 3, 5, and 9 of the indictment each charge Scott with carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c). (*See* Indictment, at Counts 3, 5, 9). When reviewing the sufficiency of the evidence on a § 924(c) charge, this court must assess "whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt." *United States v. Powell*, 469 U.S. 57, 67 (1984); *accord United States v. Jackson*, 300 F.3d 740, 747 (7th Cir. 2002) ("The test is whether, after viewing the evidence, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979))). Such an assessment requires that the "evidence and all reasonable inferences that can be drawn from it [ ] be viewed in the light most favorable to the government." *United States v. Gardner,* 238 F.3d 878, 879 (7th Cir. 2001) (quoting *United States v. Frazier,* 213 F.3d 409 (7th Cir. 2000)).

Conviction on a § 924(c) violation "requires proof that the defendant[ ] possessed a 'firearm' . . . ." *United States v. Moore*, 25 F.3d 563, 566 (7th Cir. 1994). At trial, the government presented several witnesses who testified that they observed the men involved in robbing Value Mart, Ralph's Foods, and The Store carrying guns or handguns. For example, Percy Tucker, a witness to the Value Mart robbery, stated he

was approached by "three gunmen" who had "a couple assault rifles and some kind of small handgun." (T. Tr. Vol. 2, at 36-37). Carl Frieson, also present at the Value Mart robbery, testified that he believed one of the robbers carried a long assault rifle, (T. Tr. Vol. 2, at 103), and Patricia Bentley testified that she saw one of the Value Mart robbers carrying a handgun, (T. Tr. Vol. 2, at 110, 120-21, 128). As to the robbery at Ralph's Foods, Barbara Goings, a customer service representative working on the day of the robbery, testified that she saw one of the robbers carrying a "large, long, boxy gun." (T. Tr. Vol. 2, at 144). Lori Coundiff, Ms. Goings co-worker, stated that one of the men who robbed Ralph's Foods "pointed his gun at me and told me not to move." (T. Tr. Vol. 2, at 165). And, at the robbery of The Store, the head manager, Ahmad Musleh, testified that one of the men involved in the robbery had what Musleh thought to be a .45 handgun. (T. Tr. Vol. 2, at 254).

Scott maintains that despite all of the testimony described above, sufficient proof on his § 924(c) charges remains lacking because "no one from any of the witnesses were able to identify as a matter of law that these robbers carried 'firearms' as defined in Title 18 U.S.C. 921(a)(3)." (Def.'s § 2255 Mem., at 18).[10] However, "one need not be a firearm expert to testify that he or she has seen somebody carrying a gun." *Moore*, 25 F.3d at 566. In *Moore,* the court found that the testimony of three witnesses with minimal amount of familiarity with firearms "was sufficient to allow the jury to infer that the

_____

[10] A firearm is described in 18 U.S.C. § 921(a)(3) as "[a]ny weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive."

23

defendants carried firearms as that term is defined in section 921(a)(3)." *Id.* at 568*; see also Parker v. United States*, 801 F.2d 1382, 1383-85 (D.C. Cir. 1984) (sufficient evidence supported jury verdict that defendant had used or carried a "firearm" where government did not introduce weapon or evidence that it had been fired, but two bank tellers testified that defendant had carried a gun). Ultimately, witnesses do not need to have "any special knowledge about firearms for their testimony to suffice." *Moore*, 25 F.3d at 568 (citations omitted). This is particularly true "when the gun is pointed in the witness's face." *Id.* at 566.

In the case at hand, at least three of the witnesses to the various robberies testified that one of the robbers had a gun pointed directly at them. (*See, e.g.,* T. Tr. Vol. 2, at 38[11], 128[12], 165[13]). Moreover, while none of the witnesses were technically experts on firearms, at least two of the witnesses, Percy Tucker and Carl Frieson, had previous experiences with guns and were presumably relatively familiar with them. (*See* T. Tr. Vol. 2, at 55, 104). Based upon this evidence, "any rational trier of fact could have found . . . beyond a reasonable doubt," *Jackson*, 300 F.3d at 747, that Scott, as a participant in the robbery of Value Mart, Ralph's Foods, and The Store, carried a "firearm" during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c).

---

[11] Percy Tucker testifies that "the guy had me laying down with a gun on me."

[12] Patricia Bentley describes one of the robbers at Value Mart as holding a gun approximately eight inches from the right side of her head.

[13] Lori Coundiff testifies that "one robber pointed his gun at me and told me not to move."

The court's analysis of this issue is not yet over however, as Scott appears to be particularly concerned that the government presented no evidence "in which a jury could infer" that the weapons used in the robberies were "firearms" as opposed to "antique firearms[14]," (*see* Def.'s § 2255 Mem., at 20), which are ultimately exempted from the criminal prohibitions of the Gun Control Act of 1968 by 18 U.S.C. § 921(a)(3). Although the Seventh Circuit does not appear to have directly addressed the issue, several other Circuits have held that the antique firearm exception to the Gun Control Act of 1968 is an affirmative defense that must be presented by the defendant and supported by some evidence before the government has to prove the contrary beyond a reasonable doubt. *See United States v. Hartsock*, 347 F.3d 1, 7-8 (1st Cir. 2003); *United States v. Lawrence*, 349 F.3d 109, 123 (3d Cir. 2003); *United States v. Washington,* 17 F.3d 230, 232 (8th Cir. 1994); *United States v. Smith,* 981 F.2d 887, 891-92 (6th Cir. 1992); *United States v. Laroche,* 723 F.2d 1541, 1543 (11th Cir. 1984); *United States v. Mayo,* 705 F.2d 62, 76 (2d Cir. 1983). This court agrees that the antique firearm exception to the provisions of the Gun Control Act of 1968 is an affirmative defense.

Accordingly then, Scott bore the burden of producing sufficient evidence to raise the antique firearm exception as an issue at trial; and, since he did not raise the exception, the government was not required to provide any proof at all that the weapons used in the robberies were in fact "firearms" as opposed to "antique firearms."

---

[14] An antique firearm is described generally as "any firearm manufactured in or before 1898." 18 U.S.C. § 921(a)(16)(A).

Of course, Scott might now argue that his attorney was ineffective in failing to raise the antique firearm exception as an affirmative defense. Yet, Scott does not, in this § 2255 proceeding, present one shred of evidence suggesting that the guns involved in the robberies might indeed have been antique firearms as defined in § 921(a)(16)(A).[15] Ultimately, in failing to offer any explanation or make any showing of what evidence his attorney might have used to place the age of the firearms in issue (and thus meet Scott's burden of proof on the affirmative defense), Scott has not cast any doubt on his counsel's performance.[16] Therefore, the court hereby denies Scott's request for relief on this issue.

E. *Failure to Define the Term "Firearm"*

Scott next contends that his attorney rendered ineffective assistance in failing to object to the court's jury instructions specifically relating to Counts 3, 5, and 9.[17] Scott

___

[15] Perhaps tellingly, Scott does not ever allege in his § 2255 motion that the firearms used in the robberies were actually antiques. He simply argues that the government did not prove that the guns were not antiques.

[16] The court notes that the evidence produced at trial strongly suggests that the guns used in the robberies were *not* antiques. For example, Percy Tucker and Patricia Bentley, witnesses to the Value Mart robbery, each identify at least one of the guns involved in that robbery as having a "banana clip." (*See* T. Tr. Vol. 2, at 39, 111). As far as this court is aware, guns manufactured in or before 1898, *see* 18 U.S.C. § 921(a)(16)(A), do not have "banana clips."

[17] The court's instruction on Counts 3, 5, and 9 states, in pertinent part:

To sustain the charge of carrying a firearm during or in relation to a violent crime . . . the government must prove the following propositions for each count:

ultimately argues that the instructions were misleading and "failed to guide the jury on the offense actually charged " in as far as the instructions did not include the definition of the term "firearm." (Def.'s § 2255 Mem., at 21-23). Scott does not elaborate on how the failure to define "firearm" might have somehow mislead the jury, but, in any event, "it is not error . . . to fail to give a definition of a statutory term or phrase that carries its natural meaning and that meaning is accessible to lay jurors." *United States v. Castillo*, 406 F.3d 806, 821 (7th Cir. 2005) (citations omitted). The term "firearm," as used in § 924(c) carries, this court thinks, its "natural meaning," or rather, bears a very ordinary meaning which is undoubtedly "accessible" to persons outside a court of law, and therefore need not have been defined in this court's instructions on Counts 3, 5, and 9. *Cf. United States v. Sherwood*, 770 F.2d 650, 654 (7th Cir. 1985) ("In view of the ordinary meaning the term 'willfully' has under section 3150 we do not think it likely that the

---

> FIRST:      that [Scott] committed the crime of robbery which effected interstate commerce, as charged in Counts 2, 4, [ ], and 8 on or about the date specified; and

> SECOND:      that [Scott] knowingly carried a firearm during and in relation to that crime . . . .

(Court's Instruction No. 23).

The court also gave the following instruction in relation to Counts 3, 5, and 9:

> A defendant carries a firearm when he transports the firearm on his person or in a vehicle and does so during and in relation to the violent crime that he is committing.

(Court's Instruction No. 24).

failure to define the term confused the jury."); *United States v. Rhodenizer,* 106 F.3d 222, 225 (8th Cir. 1997) (failure to define the term "carries" in an instruction relating to a § 924(c)(1)(A) charge was not error because "carries" is a commonly understood term). Thus, Scott's attorney did not act unreasonably in not objecting to this court's instruction on Counts 3, 5, and 9.

Even if, however, the term "firearm" should have been defined, and thus Scott's attorney erred in failing to object the omission of the definition, it matters very little in the context of this ineffective assistance inquiry. The jury in this case heard overwhelming evidence that those involved in the robberies at Value Mart, Ralph's Foods, and The Store carried what several witnesses variously described in detail as guns and/or rifles and/or handguns during the commission of those robberies. (*See, e.g.,* T. Tr. Vol. 2, at 36-37, 103, 110, 120-21, 128, 144, 165, 254). Given such evidence, it is inconceivable that had a definition of "firearm" been given, the jury would somehow have decided that Scott and his co-defendants did not carry "firearms" (as that term is legally defined) in violation of § 924(c). Thus, even if Scott's attorney was deficient in failing to object to the instructions relating to the § 924(c) charges, Scott suffered no prejudice from that failure. *See Strickland,* 466 U.S. at 687 (To succeed on a claim of ineffective assistance, a defendant must demonstrate both that his counsel's performance in a certain specified situation was unreasonably deficient *and* that "the deficient performance prejudiced the defense."). Consequently, the court denies Scott relief on this issue.

F. *Neglected Testimony*

Scott next argues that his attorney rendered ineffective assistance by failing to

call Miriam Scott, Victoria Buggs, and Otis Clanton as witnesses at trial to testify on

Scott's behalf. (Def.'s § 2255 Mem., at 25-28).[18] Like all other claims of ineffective

assistance, this claim is also governed by the *Strickland* standard. Accordingly, to prove

that his attorney was ineffective by not presenting these witnesses at trial, Scott must

show not only that his attorney's decision (if there was such a decision) to not present

these witnesses fell below the legal profession's objective standards for reasonably

effective representation, but also that the outcome of his trial would likely have been

different had these witnesses testified. *See Strickland*, 466 U.S. at 687.

Before the court proceeds to the merits of this ineffective assistance argument,

the court believes it important to note that it is not clear from the record or from Scott's

---

[18] Ms. Scott, Ms. Buggs, and Mr. Clanton have each provided this court with a signed and notarized affidavit attesting to what their testimony would have been had they been called to testify at Scott's trial. (*See* Def.'s § 2255 Mem., at Exs. A-C). Scott ultimately labels these three witnesses as "alibi witnesses." (Def.'s § 2255 Mem., at 25). However, Scott uses the term "alibi" incorrectly in describing at least two of the witnesses he argues should have been called on his behalf. The definition of "alibi" is: "[a] defense that places the defendant at the relevant time of crime in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party." BLACK'S LAW DICTIONARY 71 (6th ed. 1990). In view of this definition, only one of Scott's alleged witnesses, Victoria Buggs, could, based upon the information contained within her affidavit, be considered as providing Scott with a potential alibi. Indeed, Scott does not argue that the other two witnesses, Miriam Scott and Otis Clanton, can place him at locations other than those where the crimes of which he was convicted were committed. Instead, he argues that their testimony would "discredit" the testimony of Tommy Sherrell Johnson and Edward Colier, two government witnesses who identified Scott as a participant in the robberies of Ralph's Food, The Store, and/or Value Mart. (Def.'s § 2255 Mem., at 25-28, Ex. A, Ex. C).

§ 2255 motion that Scott ever discussed these potential witnesses with his attorney. Indeed, Scott has never before argued, nor does he argue now that he specifically told his attorney about, or provided his attorney with the names of the witnesses he currently argues were important to his case. If Scott did not specifically inform his attorney about these witnesses, then Scott's attorney surely cannot be found ineffective; an attorney cannot call witnesses of which he is unaware.

### 1. Purported Testimony of Miriam Scott

Scott begins by arguing that his attorney was ineffective in failing to call Miriam Scott ("Miriam") as a witness to discredit the testimony of government witness Tommy Sherrell Johnson ("Johnson"). (Def.'s § 2255 Mem., at 25-26). Johnson testified that he participated as the driver in The Store robbery and that Scott was one of his accomplices. (T. Tr. Vol. 3, at 172-74). During this testimony, Johnson admitted that he went to the police and told them about the robbery because he was angry with three of Scott's co-defendants, Nate Rimpson, Drew Carter, and Carl Buggs, for beating him up sometime after the robbery of The Store. (T. Tr. Vol. 3, at 171-72).

Scott does not, interestingly, take issue with Johnson's identification of him as a participant in the robbery of The Store, but rather takes issue with the reason behind Johnson's beating. Scott contends that the government established that the premise of the beating was robbery money, when, Scott argues, Miriam, had she testified, would have demonstrated the premise of the beating was that Johnson had stolen some items from Scott's girlfriend. (Def.'s § 2255 Mem., at 26, Ex. A). From Miriam's testimony,

Scott argues that the jury could have concluded "that Johnson was untruthful when testifying as to his motive for relaying information about [Scott] to the [police]." (Def.'s § 2255 Mem., at 26).

As an initial matter, this court has trouble understanding how exactly it is that Miriam's testimony would, as Scott suggests, have demonstrated "that Johnson was untruthful when testifying as to his motive for relaying information" to the police. (Def.'s § 2255 Mem., at 26). Based on Johnson's testimony, the motivating factor behind Johnson's going to the police appears to have been the beating he received at the hands of some of Scott's co-defendants. (*See* T. Tr. Vol. 3, at 171-72). The reason behind that beating is ultimately irrelevant because regardless of why Johnson was beat up, the fact is that he was beat up (even Scott admits as much); and again, the beating itself, not the reason behind the beating, appears to have been the motivating factor behind Johnson's going to the police, (*see* T. Tr. Vol. 3, at 171-72).

Also, it is not clear from where Scott derives his belief that the government established Johnson's beating was over robbery money. Johnson did, during questioning concerning the beating, affirm that he had been asking for his cut of the money from The Store robbery. (*See, e.g.,* T. Tr. Vol. 3, at 178). However, Johnson directly stated that he believed the beating was over the fact that he was "supposed to broke in somebody house." (T. Tr. Vol. 3, at 177). Therefore, had Miriam testified to the fact that Johnson was beat up over an alleged break-in, it seems her testimony would have corroborated (and not contradicted) that of Johnson. Accordingly, even assuming

31

*arguendo* that Scott's attorney was ineffective in failing to call Miriam as a witness, Scott clearly did not suffer prejudice from that failure.

### 2. Testimony of Victoria Buggs

Scott next argues that his attorney was ineffective in failing to call Victoria Buggs ("Victoria") as a witness because, according to Scott, Victoria (who appears to be Scott's mother) would have placed Scott in Fort Meade, Maryland on the date the robbery of The Store took place. (Def.'s § 2255 Mem., at 27, Ex. B). In other words, Scott argues that Victoria would have provided him with an alibi. (*See* Def.'s § 2255 Mem., at Ex. B). However, all Victoria's affidavit definitively states is that Scott was in Fort Meade, Maryland on February 5, 1998, which is 21 days before The Store robbery took place in Gary, Indiana on February 26, 1998. (*See* Def.'s § 2255 Mem., at Ex. B). With regard to where Scott might have been on February 26, 1998, Victoria's affidavit merely states that she believes Scott left Fort Meade, Maryland "on or about" the morning of February 26. (*See* Def.'s § 2255 Mem., at Ex. B). The phrase "on or about" – which just so happens to be a very convenient, non-committal, crafty, and (perhaps unfortunately) widely used legal catch-phrase – is hardly conclusive of Scott's whereabouts on the day The Store was robbed. Ultimately, Victoria's "on or about" testimony equates to, in lay language, a "maybe, maybe not." Such "maybe, maybe not" testimony would have done little to negate or contradict Johnson's detailed testimony that Scott was in fact in Indiana on February 26, 1998, and was involved in the robbery of The Store. (*See, e.g.* T. Tr. Vol. 3, at 171-74, 178, 180-81). Thus, even had Scott's attorney committed error in not

32

calling Victoria Buggs to testify on behalf of her son, Scott was not prejudiced by such

an error in light of the overwhelming evidence placing him at the scene of the robbery

of The Store.

### 3. Testimony of Otis Clanton

Finally, Scott argues that his attorney was ineffective in failing to call Otis

Clanton ("Clanton") as a defense witness. (Def.'s § 2255 Mem., at 27-28). According to

his affidavit, Clanton would have testified that "on or about September 11, 1997," he

gave Scott $5,000.00 to post bond for his (Scott's) brother Carl Buggs ("Buggs"), who

was then residing in the Lake County Jail in Crown Point, Indiana. (Def.'s § 2255 Mem.,

at Ex. C). Scott states that such testimony "was very important" to his defense because it

would have contradicted the testimony provided by Johnson and another turncoat

witness, Edward Colier ("Colier"), that Scott (and others) robbed Value Mart on

September 6, 1997 to obtain bail money for Buggs. (Def.'s § 2255 Mem., at 27).

First and foremost, it is important to note that it is not as clear as Scott would

have this court believe that Clanton's testimony is in fact contradictory to the testimony

of Johnson and Colier. Indeed, neither Johnson nor Colier ever testified that the Value

Mart robbery was in fact the source of the money eventually used to bond Buggs out of

jail. Rather, both merely testified that Scott *told* them that *he planned on using* some of the

money obtained from the robbery of Value Mart to get his brother out of Lake County.

(*See* T. Tr. Vol. 3, at 184, 252). Ultimately, Clanton's testimony – that is, that he gave

Scott money to pay Buggs' bond – suggests *absolutely nothing* about the truthfulness of

Johnson's and Colier's statements *as to what they were told* by Scott.

Moreover, in his affidavit, Clanton states that he provided Scott with bond money "on or about September 11, 1997," which, give or take a few days on the basis of the non-committal phrase "on or about," is approximately 5 days after the robbery of Value Mart. (Def.'s § 2255 Mem., at Ex. C). Therefore, even had the jury heard Clanton's testimony, it could have nonetheless *reasonably* assumed that at least part of the purpose of the Value Mart robbery was (just as Scott told Johnson and Colier, and Johnson and Colier repeated on the stand) to get money to bond Buggs out of jail – a purpose which became moot once Clanton apparently pledged his help five days or so after the robbery took place. The jury could also have reasonably assumed, given other evidence presented, that it was Scott himself who was perhaps untruthful in his statement to Johnson and Colier that the robbery money was going to go toward Buggs' bail. Indeed, according to Colier, Scott and his co-defendant Nate Rimpson owed Colier $500.00 for stealing a car, but got out of paying Colier by claiming that all the money left from the Value Mart robbery had to be used for Buggs' bond. (T. Tr. Vol. 3, at 252).

Thus, not only does Clanton's purported testimony on his philanthropic endeavor *not*, as Scott argues, suggest anything about truthfulness of the testimony provided by Johnson and Colier, it also certainly does not, in light of other evidence presented, compel only one reasonable conclusion by a jury. Ultimately, considering the overwhelming evidence presented that Scott was party to the Value Mart robbery, Clanton's testimony, even if heard by the jury, would hardly have provided Scott with

"a reasonable shot at acquittal." *See Gibbs*, 329 F.3d at 584. Therefore, even should

Scott's attorney have performed deficiently by failing to call Clanton as a defense

witness, Scott did not suffer any prejudice. *See Kimmelman*, 477 U.S. at 374 ("The essence

of an ineffective-assistance claim is that counsel's unprofessional errors so upset the

adversarial balance between defense and prosecution that the trial was rendered unfair

and the verdict rendered suspect."). Accordingly, Scott's claim for relief on this issue is

hereby denied.

G. *Failure to Prove Interstate Commerce Nexus*

Scott's next ineffective assistance claim focuses upon the "interstate commerce"

element of the charged Hobbs Act violations. "In order to prosecute an individual

under the Hobbs Act, the federal government bears the onus of proving that the

accused's conduct affected interstate commerce. This proof differentiates Hobbs Act

violations from common law robbery." *Peterson*, 236 F.3d at 851. Scott argues, rather

generally, that the government did not meet its burden in proving that the robberies for

which he was convicted at all affected interstate commerce. (*See* Def.'s § 2255 Mem., at

29-37). Accordingly, Scott argues his attorney was ineffective in failing to object to the

(lack of) evidence on the interstate commerce element of the Hobbs Act charges.

Clearly, Scott misunderstood the evidence presented at his trial, or rather, he

generally misunderstands what exactly is necessary to prove that a particular robbery

had an "affect on interstate commerce" under the Hobbs Act. "[T]he Hobbs Act only

requires that the government show a *de minimis* effect on interstate commerce to 'bring

35

robbery within its prosecutorial reach.' " *United States* v. *Sutton*, 337 F.3d 792, 796 (7th

Cir. 2003) (quoting *Peterson*, 236 F.3d at 851-52). To demonstrate the requisite *de minimis*

affect upon commerce, the government may present evidence under what is commonly

called the "Depletion of Assets" theory, pursuant to which the government is required

to demonstrate that the business involved in a particular robbery was either actively

engaged in interstate commerce or customarily purchased items in interstate commerce,

and had its assets depleted by the robbery, thereby curtailing its potential as a

purchaser of such goods. *Peterson*, 236 F.3d at 854.

        As Scott himself readily admits (although not knowingly), the government

clearly, through the testimony of several witnesses, established the "Depletion of

Assets" theory at trial. (*See* Def.'s § 2255 Mem., at 31-33).[19] First, the government proved

that each of the stores involved in the robberies for which Scott was convicted bought

most of their stock from outside the state of Indiana. (*See* T. Tr. Vol. 2, at 133-34[20], 234-

---

[19] In his § 2255 motion, Scott notes that the government proved at trial that
Ralph's Foods, Value Mart, and The Store each bought goods from outside the state of
Indiana and had those goods delivered to Indiana. (Def.'s § 2255 Mem., at 31-33). Yet,
for Scott, this evidence is apparently not good enough to prove an affect on interstate
commerce for purposes of the Hobbs Act. (*See* Def.'s § 2255 Mem., at 33-34).

[20] Ralph Fernandez, the owner of Ralph Food's, testified to the following:

**Q**: Now, sir, back during [the time period of the robbery], would you tell
again the jury the volume of business you did and what was the primary
supply or item that you sold?
**A**: At that time, we were probably doing 80 to $90,000 a week. Our
primary supplier was Centrella grocery out of Franklin Park, Illinois.
                                * * * * * * *
**Q**: When you mentioned Centrella, where is Centrella?

35[21], 245[22]). Second, the government proved that monetary proceeds were taken from

the stores during the robberies, (*see* T. Tr. Vol. 2, at 130[23], 234[24], 244[25]), and therefore, the

---

> **A**: In Franklin Park, Illinois.
> **Q**: So, the items that you ordered from them traveled from Illinois to your store in Indiana?
> **A**: Yes, they did.

[21] Robert Green, Secretary Treasurer of GGM Corporation (of which Value Mart was a "d/b/a"), testified to the following:

> **Q**: And would you just briefly tell the jury how you purchased or how your business purchases the items that are sold at Value Mart?
> **A**: Everything is purchased, I guess you'd say, on credit. Certified Grocers of Illinois is our main supplier. They are out of Hodgkins, Illinois. We buy magazines from Charles Levy, which is out of downtown Chicago. We have deliveries . . . . And as far as the Certified Grocer deliveries, daily.
> **Q**: And again, daily then coming from the State of Illinois.
> **A**: That's correct.

[22] Ahmad Musleh, Head Manager of The Store, testified to the following:

> **Q**: Tell the jury what The Store sells? What are your products?
> **A**: Groceries, meat, produce.
> Q: And where do you obtain some of those items.
> **A**: From Centrella Groceries, from the warehouse. Centrella.
> **Q**: And Centrella is located where?
> **A**: In Chicago.

[23] Ralph Fernandez testified to the following:

> **Q**: Would you tell the jury what occurred in regards to you and [Ralph's Foods] on September 2, 1997 in regards to a robbery?
> **A**: We were robbed, and relieved of $5,515.89.

[24] Robert Green testified to the following:

> **Q**: . . .[D]id you determine whether or not in fact you and [Value Mart] had suffered a financial loss?
> **A**: Yes, we did. Yes I did.
> **Q**: And what was that loss, if anything?

stores lost some of their ability to purchase their out-of-state stock. In other words, the government presented sufficient evidence to prove the "Depletion of Assets" theory,[26] which, as already noted, establishes the *de minimis* affect on interstate commerce necessary for purposes of sustaining a conviction under the Hobbs Act. Therefore, Scott's trial attorney certainly was *not* ineffective for failing to object to what was sufficient evidence on the interstate commerce element of the charged Hobbs Act violations. Thus, Scott's request for relief on this issue is denied.

H. *A New Legal Theory on Appeal*

In his next claim, Scott charges that his appellate counsel was ineffective in failing to object to the government's use of a new legal theory – the "Depletion of Assets" theory – on appeal, thereby allowing Scott's Hobbs Act convictions to be affirmed on a theory that had never been presented to the Trier of Fact. (Def.'s § 2255

---

**A**: Little over $11,000.

[25] Ahmad Musleh testified to the following:

**Q**: Did you, as head manager [of The Store], become aware that money was taken?
**A**: Yes.
**Q**: And did you determine how much of a loss you suffered?
**A**: Yes.
**Q**: And how much was that?
**A**: Around possibly $10,000.

[26] The Seventh Circuit noted as much in its opinion affirming Scott's convictions. It stated: "Evidence [presented at trial] allowed the jury to conclude that all of the victims purchased inventory from other states, and that [the businesses were] impeded by thefts of either the goods or the proceeds of sales . . . .". *See United States v. Buggs*, 6 Fed. Appx. 484, 486 (7th Cir. 2001).

Mem., at 38). However, while the phrase "Depletion of Assets theory" may have been first heard during Scott's appeal, the "theory" itself was not new. Ultimately, as discussed in Section III.G, the "Depletion of Assets" theory is really just a simplified label for the presentation of certain evidence establishing the *de minimis* affect on interstate commerce necessary to bring robbery within the prosecutorial reach of the Hobbs Act. *See Sutton*, 337 F.3d at 796; *Peterson*, 236 F.3d at 851-52. At trial, the government clearly presented a series of evidence equating to what is termed the "Depletion of Assets" theory considering that it showed, through testimony, that the businesses involved in the robberies for which Scott was convicted customarily purchased items in interstate commerce, and had their assets depleted by the robberies, thereby curtailing their potential as a purchaser of such goods. (*See* T. Tr. 130-34, 234-35, 244-45).[27]

Accordingly, the government did not present a new theory of criminal liability on appeal as Scott suggests. Instead, the government simply put a name to the series of evidence it presented at trial demonstrating that the robberies perpetrated by Scott (and others) did indeed have an affect on interstate commerce. Consequently, Scott's

---

[27] Of course, it is easy to see why, upon hearing the phrase "Depletion of Assets theory" for the first time on appeal, Scott may have been led to believe that the government was presenting the Appellate Court with a new hypothesis of the case. The term "theory" undoubtedly seems to connote some grandiose legal concept. It seems more appropriate, perhaps, to do as the Seventh Circuit did in this particular case and label "Depletion of Assets" a "theme" rather than a "theory." *See Buggs*, 6 Fed. Appx. at 486. Indeed, the word "theme" better describes what courts are actually referring to in such cases – a topic or "theme" of an evidentiary inquiry rather than a true legal "theory."

appellate attorney was not ineffective for failing to raise this (non)issue on appeal.

I. *Blakely/Booker*

Lastly, in a supplemental filing, Scott argues that in light of the Supreme Court's decision in *Blakely*, 542 U.S. 296, and *Booker*, 125 S. Ct. 738, his sentence is unconstitutional because its length was increased based on factual findings made by the court by a preponderance of the evidence. (*See* Def.'s Supp. in Cause No. 2:02 CV 125, at docket # 7). The Court of Appeals has already held, however, that the right recognized in *Blakely/Booker* is not retroactively available in collateral attacks on a sentence via § 2255. *McReynolds v. United States*, 397 F.3d 479 (7th Cir. 2005). Thus, *Blakely/Booker* provides no basis for relief. The court's denial of relief on this ground is without prejudice, however, to Scott's right to seek permission to file a second § 2255 motion in the event that the Supreme Court at a future time does declare that the holding of *Blakely/Booker* is retroactively available.

## IV. CONCLUSION

After thoroughly analyzing each of Scott's arguments and the Government's response, this court finds that Scott's constitutional rights have been respected, and that the sentence imposed was the culmination of fundamentally fair proceedings. Therefore, this court hereby **DENIES** Scott's "Motion to Vacate, Set Aside, or Correct Sentence" pursuant to § 2255. (Docket # 3, in Cause No. 2:02 CV 125; docket # 233, in Cause No. 2:99 CR 86). This proceeding is therefore **DISMISSED WITH PREJUDICE** excepting Scott's *Blakely/Booker* claim, which is **DISMISSED WITHOUT PREJUDICE**

to Scott's right to seek permission to file a second § 2255 motion in the event that the

Supreme Court at a future time does declare the holding of *Blakely/Booker* retroactively

available. The Clerk shall record a **FINAL JUDGMENT** accordingly.

**SO ORDERED.**

**Enter**: July 15, 2005

        ___s/James T. Moody_____
        JUDGE JAMES T. MOODY
        UNITED STATES DISTRICT COURT